[Crim. No. 7655.   Second Dist., Div. Two.   Nov. 27, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. THOMAS GILBERT VALLES, Defendant and Appellant.

364

Ellery E. Cuff, Public Defender, Lothair Schoenheit and James L. McCormick, Deputy Public Defenders, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Matthew M. Kearney, Deputy Attorney General, for Plaintiff and Respondent.

FOX, P. J.—In an information filed by the district attorney, appellant and codefendants Baca and John Valles were accused in Count I of burglary (Pen. Code, § 459) in that these defendants, on or about October 27, 1960, entered the Live Hardware Store, 1511 Mission Street, South Pasadena, with intent to commit theft. In Count II the defendants were also accused of burglarizing Berry & Sweeney Drug Store, in Pasadena, on October 2, 1960; and in Count III these defendants were accused of violating section 11500, Health and Safety Code, in that on October 27, 1960, they unlawfully had posses-

sion of a narcotic, to wit, morphine sulphate. John Valles entered a plea of guilty to Counts I and III. Appellant and defendant Baca had a jury trial. After all parties had rested, the information was amended upon the People's motion adding "dolophine hydrochloride, dilaudid, codeine" to Count III. Motions by appellant and defendant Baca to reopen and for continuance by reason of this amendment were denied. Appellant was found guilty of burglary as charged in Count I (the hardware store) and guilty of violating section 11500, Health and Safety Code (possession) as charged in Count III. His motion for a new trial was denied. He has appealed from the order denying said motion and from the judgment.

Having closed the hardware store and locked the doors and windows at approximately 6 p. m. on October 26, 1960, William Mason, manager, returned to the store shortly before 8 a. m. the following morning to find the premises in disarray and the door of the safe ripped open. Missing from the safe were a personal checkbook of Mason's father and four commercial books of S & H green stamps. Approximately $14 in cash and another book of S & H stamps were also missing from the three cash registers in the store. Entrance was effected by pushing aside an air conditioning pipe in the rear wall and crawling through the opening. Near the safe was a large quantity of white fire clay and asbestos material which had been dropped from the door of the safe when it was ripped open. There were numerous footprints throughout the store caused by tracking of this white powder. There appeared to be three different sets of footprints, two, apparently, about the same size and the third somewhat larger.

While on duty sometime after 1 o'clock in the morning of October 27th, Officer Taylor, of the South Pasadena Police Department, observed from his desk a blue Mercury with white side wall tires being driven slowly past and turn right on Mission Street in the direction of the hardware store, which was only a short distance from the police station. This same car came by the police station twice shortly thereafter, each time traveling very slowly. There were two people in the car. The driver looked toward the police station, but the officer was not able to recognize either the driver or the passenger. At approximately 4:30 a. m. on the 27th, Officer Johnson wrote a parking ticket for a 1950 blue Mercury, license No. ULF 295, for violating the city ordinance against night parking on the street between 2 a. m. and 6 a. m. The car was parked "directly to the rear" of the hardware store. The officer last saw it

there "a little after 5:00 a. m." No other cars were parked there that morning.

Captain Spriggs, of the South Pasadena Police Department, testified that he first learned of the burglary of the hardware store through a telephone call to his home shortly before 8 o'clock; that he first saw the parking ticket at approximately 9 o'clock; that he had talked to Officer Johnson about it. Captain Spriggs also made an investigation at the hardware store. He observed a large quantity of white fire clay powder and asbestos material where the door of the safe had been broken open; also there were numerous footprints of white powder leading to the cash registers, to the basement, and to the office, where numerous tools were scattered on the floor. About two hours later that morning he observed a blue Mercury, with white sidewall tires, bearing license No. ULF 295, parked in the driveway at 1309 North Raymond, Pasadena. Captain Spriggs had previously checked with the Department of Motor Vehicles and learned that this vehicle was registered to John Valles, 1309 North Raymond. Captain Spriggs and other officers then went to this address, which is a two-unit building with two stories. Captain Spriggs knocked on the door downstairs and a lady answered; she told the officers that the car belonged to people upstairs; that their name was Valles, and that they were at home. Captain Spriggs and the other officers proceeded upstairs, knocked on the door, and, after waiting "a little bit" and receiving no response, sprang the lock and entered. The door entered into the kitchen. There Captain Spriggs observed a large cardboard box containing numerous electrical appliances and tools, bearing large pencil markings and tags indicating that they were new. Captain Spriggs saw John Valles enter the kitchen from the front room and immediately placed him under arrest. Thomas Valles (appellant) and Baca were in separate beds in the front room; they were placed under arrest. A box in the living room contained three pairs of men's trousers, saturated with white powder. In front of and partially under each bed was a pair of shoes; all three pairs had a considerable amount of what appeared to be fire clay on the soles and some even on top. This powder was similar to the fire clay found in the hardware store where the safe had been ripped open. At the police station the defendants were told to take their shoes. John and Thomas Valles each claimed a pair. Baca remarked that "none of them are mine." However, the unclaimed pair appeared to fit his feet. A checkbook bearing the name A. M. Mason, and

with the address of Live Hardware Store, was recovered from a cardboard box in the apartment kitchen. A metal lunch box was found on the coffee table in the front room containing bottles and packages with labels indicating various narcotics. A paper sack with bottles bearing similar labels was also found in the kitchen. Five commercial books of S & H green stamps were recovered in the apartment. These were identified by William Mason as the ones taken from the hardware store.

A chemist examined the contents of the four bottles taken from the metal lunch box and determined that each contained the material indicated on its label, that is, morphine sulphate, dilaudid, codeine and liquid dolophine hydrochloride, all of which were narcotics. He also testified that the white powder recovered from the men's clothing found in the apartment was very similar to the fire clay in the hardware store.

Officer Sherwood had a conversation with appellant at approximately 7:30 on the evening of October 27th. Appellant stated that he was receiving narcotics in the apartment, was using an eyedropper full of various types of narcotics a day, injecting them into tattoos on his arm. He exhibited to the officer the marks from his last injection. The officer observed that it was still bleeding. Appellant stated to the officer that he had not burglarized the hardware store.

The officers did not have a search warrant nor any warrant for the arrest of either of the defendants when they entered their apartment.

Defendant John Valles assumed the responsibility for both crimes and stated that he had obtained the narcotics from the Berry & Sweeney Drug Store. He denied that appellant had anything to do with either of the burglaries. He also stated that when he arrived at the apartment at approximately 6 o'clock on the morning of October 27th appellant was there, asleep in bed. He also claimed ownership of the narcotics found in both the paper bag and the lunch box.

Appellant denied any part in the burglaries. He testified that on the evening of October 26th he went to a theater and saw two motion pictures. After that he went to the library in Pasadena, took a book out and went home. After arriving there he read for awhile and then went to bed and did not awake until Baca arrived that morning. He testified that the last time he had worn the trousers which were taken by the police was about a week before the arrest. Since that time they had been on the floor of the living room closet. He admitted he had used dolophine but insisted that it was without his

brother's permission, and that the last time he had used it was about four days prior to his arrest. The narcotics he had used were from those in the kitchen. He disclaimed, however, any dominion or control over any narcotics. He denied any knowledge of the lunch box until he saw an officer carrying it into the kitchen on the morning of his arrest.

In seeking a reversal appellant's first contention is that the search of the apartment was illegal in that it was undertaken on mere suspicion and speculation. The People, however, contend that the evidence was seized in the course of a lawful search. These contentions raise this question: Did the officers at the time they entered the apartment have reasonable cause to either search it or arrest an occupant thereof? ▮▮ Reasonable cause may be defined as "such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime." (*People* v. *Ingle*, 53 Cal.2d 407, 412 [348 P.2d 577].) ▮▮ When Captain Spriggs sprang the lock on the door of the apartment he had considerable information as to what had transpired: he knew that the hardware store had been burglarized; he had made an investigation at the scene of the crime; he had learned that during the night a 1950 or 1951 blue Mercury automobile, bearing license No. ULF 295, had been parked in back of the store and he had in his possession a duplicate of a parking ticket which had been placed on that vehicle by Officer Johnson at approximately 4:30 a. m. that morning; he had information that during the early morning hours Officer Taylor had seen a blue Mercury three times slowly circle the block in which the hardware store was located; he had checked the vehicle's license number with the Motor Vehicle Department and learned that it was registered to John Valles, 1309 North Raymond, Pasadena; he had proceeded to that address and observed the described vehicle parked in the driveway; he had learned from the landlady that the upstairs apartment was occupied by people named Valles, and that they were upstairs at that time. With this information Captain Spriggs knocked on the door to the apartment, waited a brief period and, upon receiving no response, sprang the lock and entered. With this factual background, Captain Spriggs had reasonable cause to believe that John Valles was involved in the burglary of the hardware store and to arrest him therefor. The arrest was therefore legal. Having made the arrest, a search of the apartment was reasonable and incidental thereto and appears to

have been made in good faith. The evidence was lawfully seized and was therefore properly admitted at the trial. (*People* v. *Alcala*, 169 Cal.App.2d 468, 471 [337 P.2d 558].) It appears that reasonable cause also existed for the arrest of appellant (and Baca) in that Captain Spriggs' investigation of the robbery of the hardware store had indicated to him that three persons had been involved because of the presence of three sets of white footprints. Furthermore, the large cardboard box of apparently new electric appliances and tools that the captain observed in the kitchen when he first entered, was not without significance.

■ In this connection appellant makes two incidental arguments: The first is that there was no showing that the police officers could not have obtained a search warrant before proceeding to make the search and arrest. There is no merit in this point. "The relevant test is not whether it was reasonable to procure a search warrant, but whether the search was reasonable." (*People* v. *Montano*, 184 Cal.App.2d 199, 205 [7 Cal.Rptr. 307] ; *People* v. *Winston*, 46 Cal.2d 151, 163 [293 P.2d 40].) ■ The second of these arguments is that the police failed to comply with Penal Code section 844.[1] In view of the failure of anyone to respond to Captain Spriggs' knock on the door of the apartment he could reasonably conclude that compliance with said section would be of no avail and was therefore excused. ■ On this point it is stated in *People* v. *Maddox*, 46 Cal.2d 301 [294 P.2d 6], at p. 306: " [W]hen there is reasonable cause to make an arrest and search and the facts known to him before his entry are not inconsistent with a good faith belief on the part of the officer that compliance with section 844 is excused, his failure to comply with the formal requirements of that section does not justify the exclusion of the evidence he obtains." (Accord, *People* v. *Moore*, 140 Cal.App.2d 870, 874 [295 P.2d 969].)

■ Appellant contends that the court committed reversible error in not allowing his counsel to develop the balance of a conversation Officer Sherwood had with him since part of it had been brought out on direct examination. On direct, Officer Sherwood testified that in a conversation with him

---

[1] Section 844 reads: "To make an arrest, a private person, if the offense be a felony, and in all cases a peace-officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired."

appellant denied having participated in the hardware store burglary. On cross, counsel attempted to show that appellant also told him that he went to a show that evening, then to the library and on to the apartment and to bed. The objection was sustained on the theory that such statement by appellant would be merely self-serving. Relying on section 1854, Code of Civil Procedure, appellant contends that when one part of a conversation is admitted in evidence the other party is entitled to have the entire conversation admitted. His proposition is too broad. That code section means that ''where part of a conversation . . . *material and relevant* to the issues of a case is given in evidence, the other parts of such conversation . . . having *relevant reference* to the part given may also be introduced.'' (Emphasis by the court.) (*People* v. *Richards,* 74 Cal.App.2d 279, 288 [168 P.2d 435] ; *People* v. *Hymer,* 118 Cal.App.2d 28, 35 [257 P.2d 63] ; *People* v. *Perez,* 128 Cal. App.2d 750, 755 [276 P.2d 72].) Here the only possible materiality or relevance of the excluded portion of the conversation would have been with reference to a charge that appellant's story of what he did that night was a recent fabrication. But no such charge had been made, and no suggestion along this line was made to the trial court for the admissibility of this evidence. Under the circumstances the trial court did not abuse its discretion in excluding the remaining portion of appellant's statement to the officer.

Appellant charges the deputy district attorney with prejudicial misconduct and argues that the court erred ''in allowing to stand a prosecution remark to the effect that defense counsel was destroying the evidence.'' To evaluate the comment it is necessary to reconstruct the context in which it was made. Defendant Baca had testified that one of the officers had put the shoes on top of the pants in the box, the pants being covered with fire clay, some of which had stuck to the shoes. Counsel for appellant noted for the record that the shoes were on top of the pants in the courtroom. The deputy district attorney responded that ''it doesn't make any difference now as everybody has been handling and polishing those shoes around, in fact, defense counsel were rubbing some of the fire clay off.'' It is quite apparent that the prosecutor did not charge defense counsel with ''destroying the evidence'' and it is unlikely that the jury so interpreted the remark. This no doubt accounts for the failure of the trial judge to admonish the jury to disregard it. Although it would have been better had the remark not been made, its effect was undoubtedly

slight, and could not seriously have prejudiced appellant's case. (See *People* v. *Rickman,* 67 Cal.App.2d 711 [155 P.2d 374] ; *People* v. *Byrnes,* 84 Cal.App.2d 64 [190 P.2d 286].)

▆▆▆ The final problem on this appeal relates to the amendment of Count III of the information to conform to proof by adding three other narcotics in addition to the one already charged, over the objection of defense counsel, after all the evidence had been presented and both sides had rested.

▆▆▆ Under section 1009, Penal Code, and the case law, the trial court may permit an amendment to an information at any stage of the proceedings provided : (1) the amendment does not prejudice the substantial rights of the defendant (*People* v. *Clawson,* 82 Cal.App. 422, 424 [255 P. 552] ; *People* v. *Walker,* 82 Cal.App.2d 196, 198 [185 P.2d 842] ; *People* v. *Foster,* 198 Cal. 112 [243 P. 667] ; and (2) it does not ''charge an offense not shown by the evidence taken at the preliminary examination.'' (*People* v. *Walker,* 170 Cal. App.2d 159, 163 [338 P.2d 536].)

▆▆▆ The record on appeal has been augmented by including the reporter's transcript of the preliminary examination. It discloses testimony that the three named narcotics that were added by amendment to Count III were among those found in the lunch box on the coffee table in the front room of the apartment where appellant was in bed. It is thus clear that the evidence taken at the preliminary hearing included the possession by appellant of the narcotics that were added to Count III. In this connection it should be noted that no new count was added to the information. The names of three narcotics were merely added to Count III, which charged a violation of Health and Safety Code section 11500.

It is difficult to see how any substantial right of appellant's was prejudiced by the amendment. In light of the testimony given at the preliminary hearing it cannot be said that he was taken by surprise. It is not suggested that appellant had any defense to the possession of any of the three narcotics that were added to Count III that he did not have to the possession of morphine sulphate, which was the narcotic he was initially charged with possessing. These four drugs were in the same lunch box on the coffee table. It is remote speculation indeed to theorize that a jury or juror would have found him in possession of only a part of the drugs in this box. Furthermore, appellant testified he had used dolophine hydrochloride from a vial that ''looks like'' one containing that drug that

was taken from the lunch box. Also, he told Officer Sherwood that he was "mixing various types of these narcotics and shooting an eye dropper a day into tattoos he had on his arm." Examination of his arm disclosed marks, still bleeding, where he said he had made his last injection. No showing of prejudice has been made.

The judgment and order are affirmed.

Ashburn, J., and Herndon, J., concurred.